

**ORDERED in the Southern District of Florida on July 12, 2022.**



                    **Erik P. Kimball, Judge**
                 **United States Bankruptcy Court**

_____

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | Case No. 19-15281-EPK |
| | Chapter 7 |
| HANS OTTO ALBERTSSON, | |
|     Debtor. | |
| _____/ | |
| | |
| BARCLAY BRELAND | |
| FAMILY OFFICE, LLC, | |
|     Plaintiff, | |
| v. | Adv. Proc. No. 19-01619-EPK |
| HANS OTTO ALBERTSSON, | |
|     Defendant. | |
| _____/ | |

### MEMORANDUM OPINION

       This adversary proceeding came before the Court for trial on February 10, 2022, upon the complaint [ECF No. 1] filed by Barclay Breland Family Office, LLC against Hans Otto Albertson, the debtor in this chapter 7 case. The Court considered the evidence presented at trial, the arguments of counsel, and post-trial briefs. The Court finds that Mr. Albertsson

1

knowingly and fraudulently omitted from his sworn schedules two sets of golf clubs and his membership in the Winged Foot Golf Club, and will grant the relief requested in Count I, denying Mr. Albertsson's discharge in this case. The Court finds that the plaintiff failed to prove it actually relied on the misrepresentations alleged in Counts II and III, seeking exception from discharge of the plaintiff's claims against Mr. Albertsson, and will deny all relief requested in those counts. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## Findings of Fact

Mr. Albertsson first played golf at the age of three. He excelled at the sport and received a full ride to Wake Forest University on the Worsham Scholarship, also known as the Arnold Palmer Scholarship. He graduated in 1994 and spent the next six years trying to make the PGA Tour. In the end, he only made it to the "AAA-baseball equivalent." He then decided to pursue a career in finance.

Golf continued to play a major role in Mr. Albertsson's life. He used golf to meet potential clients and to develop and maintain relationships with existing clients. Mr. Albertsson began his career at Merrill Lynch and Lehman Brothers before moving to UBS in 2011.

In 2012, Mr. Albertsson became a member of the Winged Foot Golf Club in Westchester County, New York. New members at Winged Foot Golf Club pay a $100,000 initiation fee. Mr. Albertsson borrowed part of the initiation fee from his friend and client John Koo. This was not the only loan Mr. Albertsson obtained from Mr. Koo. Mr. Albertsson admitted that FINRA regulations prohibit borrowing money from clients.

Mr. Albertsson maintained his Winged Foot Golf Club membership through trial. Yearly dues are $10,000. He did not have the funds to pay the dues himself. For 2020 and

2021, a friend paid Mr. Albertsson's dues. From the record, the identity of this friend is unclear.

In February 2016, Mr. Albertsson left UBS and started working for Crane Capital where he earned $40,000 per month. At the same time, he began discussions with Chris Kelly, the plaintiff's principal, about working with the plaintiff. Mr. Albertsson met Mr. Kelly through a mutual friend.

When Mr. Albertsson left UBS, he had substantial debts. He owed roughly $850,000 to UBS, $1,000,000 to Mr. Koo, $100,000 to Raleigh Rawls, and smaller debts to others, for a total of about $2,000,000 in financial obligations.

In May 2016, UBS sent a demand letter to Mr. Albertsson seeking repayment of the full amount he owed. Also in May 2016, Mr. Koo demanded repayment from Mr. Albertsson. The plaintiff alleges Mr. Koo's demand included threats that he would report Mr. Albertsson to FINRA for improperly borrowing money from a client and for allegedly conducting unauthorized trades on Mr. Koo's account. Mr. Albertsson did not deny that Mr. Koo made those threats, but he testified they did not occur until months later in late August or early September 2016, after Mr. Albertsson contracted with the plaintiff.

Discussions between Mr. Albertsson and Mr. Kelly eventually led to a June 2016 consulting agreement between the plaintiff and Mr. Albertsson. As part of the consulting agreement, the plaintiff advanced $500,000 to Mr. Albertsson. Mr. Albertsson agreed to repay the advance from commissions on capital he would later bring to the plaintiff. Mr. Albertsson never brought any business to the plaintiff and never repaid the advance.

Mr. Kelly testified that Mr. Albertsson requested the $500,000 advance so that Mr. Albertsson could pay regular living expenses. Mr. Albertsson testified credibly that he never discussed with Mr. Kelly how he would use the loan. Soon after entering into the consulting agreement with the plaintiff, by the end of July 2016, Mr. Albertsson used the entire loan to

3

pay $400,000 to Mr. Koo and $100,000 to Mr. Rawls. Mr. Kelly testified the plaintiff would not have made the loan if he knew how Mr. Albertsson would use the money. But the plaintiff did not meet its burden in convincing the Court that Mr. Albertsson ever said how he would use the plaintiff's advance.

The plaintiff alleges Mr. Albertsson made false representations in the consulting agreement itself. In the agreement, Mr. Albertsson represented that he owed no obligations to UBS, that UBS had not threatened litigation, that Mr. Albertsson was not obligated under any non-compete or non-disclosure agreements, and that Mr. Albertsson would devote his full professional effort to the plaintiff. The plaintiff alleges that each of these representations was false when made, and Mr. Kelly testified the plaintiff would not have entered into the consulting agreement if it was aware of these facts.

Mr. Albertsson agrees that these representations in the consulting agreement were not true when he signed the agreement. He owed substantial obligations to UBS. UBS had sent Mr. Albertsson a demand letter threatening litigation against him. He remained subject to non-solicitation and non-disclosure agreements with UBS. Mr. Albertsson did not intend to and in fact did not devote his full time to the plaintiff's business as he had obligations to another employer. However, Mr. Albertsson testified that Mr. Kelly knew all of this before the plaintiff and Mr. Albertsson entered into the consulting agreement. When Mr. Albertsson reviewed the proposed agreement, he informed Mr. Kelly of these inaccuracies. Mr. Kelly nonetheless encouraged Mr. Albertsson to sign the consulting agreement without any changes. The Court found Mr. Albertsson's testimony credible on these issues. The plaintiff did not meet its burden of convincing the Court that the plaintiff actually relied on these statements as the Court believes Mr. Albertsson's testimony that Mr. Kelly knew the true facts when they signed the agreement.

Mr. Kelly testified that the plaintiff would not have entered into the consulting agreement if he knew of Mr. Albertsson's "debt profile." But Mr. Albertsson never made any representation, written or otherwise, regarding his financial condition or his liabilities. Indeed, in the consulting agreement Mr. Albertsson agreed to provide the plaintiff with a financial statement, but none was ever provided. The plaintiff could not have relied on such a representation because no such representation was made.

The plaintiff alleges that when Mr. Albertsson entered into the consulting agreement he had no present intention to generate business for the plaintiff. In other words, the plaintiff argues that Mr. Albertsson entered into the consulting agreement solely to get the $500,000 advance and did not intend to perform at all. To the contrary, Mr. Albertsson did try to bring in business for the plaintiff. Mr. Albertsson credibly testified that he reached out to and met with potential clients in attempts to bring their business to the plaintiff. Unfortunately, nothing materialized. Mr. Albertsson's lack of success does not mean he signed the consulting agreement under false pretenses.

Mr. Albertsson filed a chapter 7 petition on April 23, 2019. In his schedules of assets and liabilities, filed under oath with his bankruptcy petition, Mr. Albertsson omitted two sets of golf clubs and his membership in the Winged Foot Golf Club. Under the category labeled "Equipment for sports and hobbies," which specifically includes "golf clubs" among a list of examples, Mr. Albertsson listed only "children's sports equipment (basketball, football, baseball) – Owned as Tenants by the Entireties" with a value of $1.00. In response to the question "Do you have other property of any kind you did not already list?", which lists "country club membership" among the examples, Mr. Albertsson answered "no". Mr. Albertsson admits he failed to list his two sets of golf clubs and his golf club membership, but he contends he never intended to mislead anyone.

5

Mr. Albertsson testified that he consulted with counsel about how to properly fill out his bankruptcy schedules because he wanted to avoid the situation he now finds himself in. Mr. Albertsson admits that he did not discuss with counsel specifically whether to list the golf clubs. Instead, he testified that his attorney told him that he needed to list only assets of material value. The Court did not find this testimony credible. Although not dispositive, the Court notes that Mr. Albertsson provided no independent corroboration that he received such advice, advice which would certainly be abhorrent to an experienced bankruptcy practitioner. Mr. Albertsson's own schedules undercut his testimony that he relied on legal advice to omit non-material items from his schedules. He scheduled several categories of items with a stated value of just $1.00, yet failed to list his golf clubs.

In light of the clear provisions in the schedules themselves, and the fact that Mr. Albertsson's entire professional career has relied on his golf skills, the Court does not believe Mr. Albertsson omitted the golf clubs from his schedules for any reason other than to mislead creditors and his trustee. It does not matter whether the golf clubs had a value that would nonetheless have been exempt from administration in this case.

Mr. Albertsson testified that he had specific conversations with his counsel regarding whether he should schedule his membership in the Winged Foot Golf Club. Mr. Albertsson testified that he omitted the membership after discussions with his attorney and communications with the club itself because he determined he was a "privilege holder" rather than a member of Winged Foot Golf Club and his interest in the club held no value. The Court did not find this testimony credible, nor did Mr. Albertsson provide any evidence to corroborate his testimony. Whether Mr. Albertsson could sell or transfer his interest in the Winged Foot Golf Club is beside the point. The fact that he maintained, at least through trial in this adversary proceeding, a membership in an exclusive golf club in a location removed from his home in Florida, which membership requires payment of a substantial annual fee,

6

would raise a number of questions for the trustee and other parties in interest. How does Mr. Albertsson pay the annual fee and other charges at the club? If someone else pays the annual fee, what is their relationship with Mr. Albertsson? How does Mr. Albertsson afford travel to the club? In light of the fact that the schedules specifically required Mr. Albertsson to list any "country club membership," the fact that Mr. Albertsson has relied on golf as a source of business his entire professional life, and the fact that revealing the Winged Foot Golf Club membership likely would have resulted in further investigation of his financial circumstances, the Court concludes that Mr. Albertsson omitted the membership from his schedules with the intent to deceive.

## Discussion

In Count I of the complaint, the plaintiff seeks an order denying Mr. Albertsson's discharge under 11 U.S.C. § 727(a)(4)(A), alleging that he made false oaths in his schedules by knowingly and fraudulently omitting the golf clubs and Winged Foot Golf Club membership. In Counts II and III of the complaint, the plaintiff seeks an order excepting its claim against Mr. Albertsson from discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B), alleging that Mr. Albertsson obtained the $500,000 loan by false representations or false pretenses. The plaintiff has the burden of proof on all claims by a preponderance of the evidence.

**Section 523(a)(2) Claims**

Section 523(a)(2)(A) provides an exception to discharge for debts obtained through "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Here, the plaintiff must show that Mr. Albertsson made a knowingly false representation not relating to his financial condition, that Mr. Albertsson intended to deceive the plaintiff, and that the plaintiff justifiably relied on the false representation. *See Field v. Mans*, 516 U.S. 59 (1995). Section 523(a)(2)(B) provides

7

an exception to discharge for debts obtained as a result of reasonable reliance on a materially false statement in writing regarding the debtor's financial condition. Here, the plaintiff must show that Mr. Albertsson made a false written representation respecting his financial condition, that he did so with the intent to deceive, and that the plaintiff reasonably relied on the false representation. As will be apparent from the Court's analysis below, the distinctions between claims under sections 523(a)(2)(A) and 523(a)(2)(B) are not important in this case as the plaintiff failed to meet its burden of proving either that the alleged misrepresentations occurred at all or that the plaintiff actually relied on the alleged misrepresentations.

The plaintiff alleges that it relied on the following representations in the consulting agreement:

- Recital C: Consultant [(Mr. Albertsson)] represents he [is] a former employee of UBS INC. and warrants that he is under no legal or contractual obligation to UBS or any of its parents, subsidiaries or related companies nor is there any litigation threatened or pending as between Consultant and UBS.

- ¶ 1: The Consultant shall devote Consultant's full business time, attention, efforts, and abilities to the Company's [(Barclay Breland)] business at its Palm Beach Gardens location unless assigned elsewhere by its President.

- ¶ 21: The Consultant hereby represents and warrants that … (d) the Consultant's services hereunder will not conflict with, or result in, a breach of any agreement, understanding, order, judgment, or other obligation to which the Consultant is party or by which Consultant or Consultant's property may be bound; and (e) the Consultant is not subject to, or bound by, any covenant against competition, confidentiality obligation, or any other agreement, or judgment, or other obligation that could conflict with, restrict, or limit the performance of the services to be provided by Consultant under this Agreement.

Mr. Albertsson agrees that these statements were false at the time he signed the consulting agreement, but testified credibly that the plaintiff knew this was the case and encouraged him to sign the agreement anyway. The plaintiff did not meet its burden in proving that it actually relied on these statements.

The plaintiff alleges that Mr. Albertsson stated he would use the $500,000 loan to pay living expenses and that he would bring his book of business with him to the plaintiff. Mr. Albertsson testified credibly that he never made these statements. The plaintiff alleges that, contrary to his promises in the consulting agreement, Mr. Albertsson did not ever intend to perform under the agreement. Mr. Albertsson testified credibly that he did intend to perform and detailed his actual attempts to perform. The plaintiff did not meet its burden to prove that Mr. Albertsson made any of these alleged misrepresentations.

The plaintiff alleges that if Mr. Albertsson had disclosed his true "debt profile," the plaintiff would not have made the $500,000 advance. There is no evidence that Mr. Albertsson made any representation, written or oral, regarding his "debt profile." Indeed, while the consulting agreement required Mr. Albertsson to deliver a financial statement to the plaintiff, the plaintiff never obtained any financial statement from him. The plaintiff did not meet its burden to prove that Mr. Albertsson made any misrepresentation about his "debt profile."

The plaintiff failed to carry its burden on each of its theories for relief under sections 523(a)(2)(A) and 523(a)(2)(B). The Court will enter judgment in favor of Mr. Albertsson on Counts II and III.

**Section 727(a)(4)(A) Claim**

Section 727(a)(4)(A) provides for denial of discharge to a debtor who knowingly and fraudulently makes a false oath or account in or in connection with a case. Only material false oaths will result in denial of discharge. False oaths are material if they relate to a debtor's financial affairs or the discovery or disposition of property. *Chalik v. Moorehead (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984). Omissions from a debtor's schedules can result in denial of discharge. *Swicegood v. Ginn*, 924 F.2d 230 (11th Cir. 1991). "Knowingly and fraudulently" requires that the debtor knew the statement was false and made it with the

intent to deceive. *In re Kempff*, 847 F.3d 444, 449 (7th Cir. 2017). A pattern of errors may show a reckless disregard for the truth sufficient to support the inference of fraudulent intent. *In re Retz*, 606 F.3d 1189, 1199 (9th Cir. 2010). Good faith reliance on the advice of counsel may prevent a finding of bad intent. *In re Zizza*, 875 F.3d 728 (1st Cir. 2017).

Mr. Albertsson admits that he omitted from his schedules two sets of golf clubs and his membership in the Winged Foot Golf Club. These are material omissions because their disclosure would have resulted in further investigation of his financial affairs. While inclusion of the golf clubs and country club membership likely would not have impacted the eventual distribution to creditors in this case, "the recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless" asset. *In re Chalik*, 748 F.2d at 618.

Mr. Albertsson testified that he relied on advice of counsel in omitting his golf clubs and country club membership from his schedules. The Court does not find his uncorroborated testimony credible. In addition to the other findings above, the Court notes that the lawyer who assisted Mr. Albertsson in filing his bankruptcy petition and schedules was not called to testify at trial. *See In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014) (noting failure of counsel to testify in support of an advice of counsel defense).

Under the circumstances of this case, as more fully discussed above in the Court's findings of fact, when Mr. Albertsson failed to disclose two sets golf clubs and his membership in an exclusive golf club, he knowingly and fraudulently made false oaths in violation of section 727(a)(4)(A). The Court will enter final judgment in favor of the plaintiff on Count I, denying Mr. Albertsson's discharge in this case.

## Conclusion

The plaintiff met its burden of proof on Count I and failed to meet its burden of proof on Counts II and III. The Court will grant the relief requested in Count I, deny the relief in Counts II and III, and enter separate judgment consistent with this Memorandum Opinion.

###

Copy to:

All parties of record by the Clerk of Court.